UNITED STATES of America, Plaintiff,

v.

Margarito ORTEGA LOPEZ, Defendant.

UNITED STATES of America, Plaintiff,

v.

Oscar Alberto HUEZO–QUEZADA, Alfredo Medina–Ortega, Raul Ortiz–Flores, Cesar Cruz–Platero, Juan Francisco Felix–Sosa, Alfredo Martinez–Martinez, Thomas Melesio–Salazar, Defendants.

UNITED STATES of America, Plaintiff,

v.

Paul Bernard Rushton ROSS, Defendant.

UNITED STATES of America, Plaintiff,

v.

Sirous SADAFI, Siew Meng Lui, Defendants.

UNITED STATES of America, Plaintiff,

v.

Randolph De CARO, Defendant.

UNITED STATES of America, Plaintiff,

v.

Bryan Maurice ROGER, Defendant.

UNITED STATES of America, Plaintiff,

v.

William BLAIR, Defendant.

UNITED STATES of America, Plaintiff,

v.

Vagan SAMVELIAN, Defendant.

UNITED STATES of America, Plaintiff,

v.

Jerry Raymond ALLEN, Jr., Defendant.

UNITED STATES of America, Plaintiff,

v.

Bobby Ray FINCH, Sidney Boddie, Defendants.

UNITED STATES of America, Plaintiff,

v.

Jack Ernest CONKLIN, Jr., Martha Gaines Conklin, Defendants.

UNITED STATES of America, Plaintiff,

v.

Felesio N. BYRD, Defendant.

UNITED STATES of America, Plaintiff

v.

Esparaza R. BATELLO, Defendant.

UNITED STATES of America, Plaintiff,

v.

Donald O. ZALESKI, Defendant.

UNITED STATES of America, Plaintiff,

v.

Rigoberto PELLEGAUD, Defendant.

UNITED STATES of America, Plaintiff,

v.

Wade Joseph DRIGGERS, Defendant.

UNITED STATES of America, Plaintiff,

v.

Ron Mack EMMETT, Defendant.

UNITED STATES of America, Plaintiff,

v.

Carlos Mario MONTOYA, a/k/a Roman Alboran, a/k/a Mauro Lopez; Defendants.

UNITED STATES of America, Plaintiff,

v.

Mark Nevin BOWDEN, Defendant.

UNITED STATES of America, Plaintiff,

v.

Douglas SHARP, Defendant.

UNITED STATES of America, Plaintiff,

v.

Julio RENGIFO-SANCHEZ, Defendant.

UNITED STATES of America, Plaintiff,

v.

Alvaro GIRALDO, Defendant.

Nos. CR 88–050–R, CR 88–087–RMT, CR 88–133–MRP, CR 88–007–TJH, CR 88–114–KN, CR 87–1034–CBM, CR 88–095–CBM, CR 87–998–PAR, CR 88–075–HLH, CR 87–1035–WJR, CR 88–109–FFF, CR 87–974–SVW, CR 87–986–SVW, CR 88–012–SVW, CR 88–117–SVW, CR 88–002–JSL, CR 88–005–JSL, CR 88–073–DT, CR 88–066–RSWL, CR

87–963–AAH, CR 87–992–DT and CR 87–1011–RJK.

United States District Court, C.D. California, En Banc.

May 5, 1988.

1508

Carlton F. Gunn., Deputy Federal Public Defender, Central Dist. of Cal., Los Angeles, Cal., for all defendants.

David Anderson, Federal Programs Branch, Civil Div., U.S. Dept. of Justice, Washington, D.C., for the government as plaintiff, and the separate Asst. U.S. Attys. in each case.

Donald A. Purdy, Jr., Deputy Gen. Counsel, U.S. Sentencing Commission, Washington, D.C., for the Commission, as amicus curiae.

Before the Court EN BANC.

## MEMORANDUM OPINION AND ORDER

HAUK, Senior District Judge.

Before this en banc panel of the Court are motions of the defendants in the above-captioned cases to declare the Sentencing Reform Act of 1984 ("Act") and sentencing guidelines ("Guidelines") promulgated thereunder by the United States Sentencing Commission ("Commission") to be unconstitutional. This en banc panel was authorized by the Court in its Order of April 22, 1988, to determine the facial constitutionality of the Act and Guidelines by way of transferring this issue from each of the cases listed in the caption to the Court as a whole, with the understanding that the remaining issues in each case remain with the Judge to whom the case was originally assigned.

 Defendants contend that the Act is invalid primarily because the placement of the Commission in the judicial branch and mandatory service of three Article III judges on the Commission violate the doctrine of separation of powers, and because the Act unconstitutionally delegates legislative power to the Commission.[1]

In an historic session held on April 18, 1988, the en banc panel heard arguments from counsel representing the defendants, the Department of Justice and the Commission (as *amicus curiae*). For the reasons which follow, we now hold the Act and the Sentencing Guidelines constitutionally invalid.

## STATUTORY FRAMEWORK

The Sentencing Reform Act of 1984, Pub. L. No. 98–473, Title II, §§ 211–239, 98 Stat. 1987, 18 U.S.C. §§ 3551 et seq., 28 U.S.C. §§ 991–998, created the United States Sentencing Commission to effectuate Congress' desire to enact sentencing reform for all federal crimes. Under 18 U.S.C. §§ 3553(a)(4) and (a)(5), a district court is required to sentence convicted offenders of all federal offenses committed after November 1, 1987 by applying the Guidelines and policy statements promulgated by the Commission pursuant to 28 U.S.C. §§ 994(a)(1) and (a)(2), respectively.

The Commission is "an independent commission in the *judicial branch* of the United States." 28 U.S.C. § 991(a) (emphasis added). The Commission's seven voting members[2] include three Article III judges. *Id.* These judge-Commissioners are appointed by the President from a list of six judges recommended by the Judicial Conference of the United States and are removable from the Commission by the President for "neglect of duty or malfeasance in office or for other good cause shown." *Id.*

The Guidelines constructed by the Commission mandate that district courts determine sentences of imprisonment from within narrow ranges of time, according to a "Sentencing Table." *See* Guidelines Manual, Chapter 5, Part A, at p. 5.2 (Oct. 1987). Each range in the Sentencing Table results from a computation of various aggravating and mitigating factors relating to the defendant and the defendant's offense(s) of conviction.[3] A court is permitted to depart

1. Defendants also contend: a) Congress has violated both the separation of powers doctrine and the compensation clause of Article III by vesting the power to remove the members of the Commission in the President; b) the Act impermissibly vests Article III powers in a nonjudicial body by authorizing the Commission to modify the sentencing guidelines upon the petition of an affected defendant, 28 U.S.C. § 994(s); and c) the Commission has failed to follow in various respects the statutory mandate set forth by the enabling act. We reject these arguments without further discussion.

2. The Attorney General of the United States, or his designee, and the Chairman of the United States Parole Commission are non-voting, *ex-of-*

*ficio* members of the Commission as well. 28 U.S.C. § 991(a).

3. Virtually all of the guidelines listed with the offenses of conviction include adjustments related to the commission of the offense. *See* Guidelines Manual, Ch. 2, pp. 2.1–2.154 (October 1987). Additional aggravating and mitigating factors include consideration of the nature of the victim of the offense, *id.*, Ch. 3, Part A, pp. 3.1–3.2; the offender's role in the offense, *id.*, Ch. 3, Part B, pp. 3.3–3.5; whether the offender impeded or obstructed the investigation or prosecution of the offense, *id.*, Ch. 3, Part C, pp. 3.7–3.8; whether the offender accepts responsibility for the offense, *id.*, Ch. 3, Part E, pp.

from the guidelines only when it finds an aggravating or mitigating factor that was "not adequately taken into consideration by the Sentencing Commission in formulating the [G]uidelines...." 18 U.S.C. § 3553(b).

## SEPARATION OF POWERS

The doctrine of separation of powers inherent in the tripartite design of the Constitution is fundamental to our federal system of government. While the foundational importance of the doctrine needs little elaboration here, its vitality and substance—persuasively presented by the framers of the Constitution (*see, generally,* The Federalist Nos. 47 (J. Madison), 73 and 81 (A. Hamilton) (Rositer ed. 1961))—have been restated, interpreted and applied in recent Supreme Court decisions. *See Bowsher v. Synar,* 478 U.S. 714, ——, 106 S.Ct. 3181, 3186–89, 92 L.Ed.2d 583, 593–97 (1986); *INS v. Chadha,* 462 U.S. 919, 951–59, 103 S.Ct. 2764, 2784–88, 77 L.Ed.2d 317 (1983).

More difficult, however, is the task of determining the degree by which the delegated powers of the legislative, executive and judicial branches must remain separate. Functionally, the doctrine of separation of powers may be violated in two ways. First, under the "expansion of powers" analysis, the doctrine may be violated when one branch assumes a function that more properly is entrusted to another. *See Youngstown Sheet & Tube Co. v. Sawyer,* 343 U.S. 579, 587–89, 72 S.Ct. 863, 866–67, 96 L.Ed. 1153 (1952); *INS v. Chadha,* 462 U.S. at 963, 103 S.Ct. at 2790 (Powell, J., concurring). Alternatively, under the "impairment of function" analysis, one branch may not unduly interfere with the performance of a coordinate branch's constitutionally assigned function. *See Nixon v. Administrator of General Services,* 433 U.S. 425, 443, 97 S.Ct. 2777, 2790, 53 L.Ed.2d

867 (1977); *United States v. Nixon,* 418 U.S. 683, 711–12, 94 S.Ct. 3090, 3109–10, 41 L.Ed.2d 1039 (1974). We conclude that the Sentencing Reform Act of 1984 is unconstitutional under both tests.

### A. *Nature and Function of the Sentencing Commission*

■ In order to ascertain whether the placement and composition of the Sentencing Commission violates the separation of powers, we must first determine its nature and function—executive, legislative or judicial. Although the Commission is expressly designated as "an independent commission in the *judicial branch,*" 28 U.S.C. § 991(a) (emphasis added), we find that the Commission is not a judicial body. Our identification of the nature and function of the Commission cannot rest merely on its statutory label but must be made by reference to its composition and powers granted to it by Congress.

Both the composition and function of the Commission lead us to the conclusion that the Commission is an executive body. The Commission's members—which include four voting and two *ex-officio* non-Article III individuals—are both appointed and removable by the President. Its statutory mandate to promulgate guidelines and policy statements under the standards set forth by Congress, 28 U.S.C. §§ 994–995, closely resembles the administrative interpretation and "rulemaking" functions properly delegated to executive agencies. *See, e.g., Bowsher v. Synar,* 478 U.S. at ——, 106 S.Ct. at 3192, 92 L.Ed.2d at 600; *United States v. Arnold,* 678 F.Supp. 1463, 1469–70 (S.D.Cal.1988); *United States v. Frank,* 682 F.Supp. 815, 821–23 (W.D.Pa. 1988).[4]

### B. *Expansion of Powers*

■ The placement and composition of the Commission each violate the prohibition

---

3.21–3.22; and the offender's criminal history, *id.,* Ch. 4, pp. 4.1–4.13.

**4.** The government and dissenting opinion necessarily concede that the Commission is an executive body. We disagree with the position taken by the Commission, and the court in *United States v. Ruiz–Villanueva,* 680 F.Supp. 1411, 1422–1423 (S.D.Cal.1988), that the Commission

is a judicial entity, created to assist the federal courts in the judicial function of sentencing. We note briefly that the judicial function of sentencing is one which consists of imposing particular sentences in specific cases, not of promulgating regulations in the abstract for prospective application.

on "expansion of powers" under separation of powers jurisprudence. First, the expansion doctrine limits the ability of one branch of government from exercising the powers delegated in the Constitution to a coordinate branch. *Youngstown Sheet & Tube Co., supra.* Accordingly, Congress' placement of the Commission, which we have found to exercise executive power, in the judicial branch unconstitutionally expands the power of the judiciary.[5]

In addition, we find ample precedent, both in long-standing Supreme Court decisions and in more recent courts of appeals cases, to support our view that Article III judges are constitutionally prohibited from performing extra-judicial government service on the order of full-time membership on the Sentencing Commission. We concur with Judge Heaney's analysis in *United States v. Estrada,* 680 F.Supp. 1312, 1330–31 (D.Minn.1988), that such service is impermissible. "[E]xecutive or administrative duties of a nonjudicial nature may not be imposed on judges holding office under Art. III of the Constitution." *Buckley v. Valeo,* 424 U.S. 1, 123, 96 S.Ct. 612, 684, 46 L.Ed.2d 659 (1976) (citing *United States v. Ferreira,* 54 U.S. (13 How.) 40, 14 L.Ed. 42 (1852); *Hayburn's Case,* 2 U.S. (2 Dall.) 409, 1 L.Ed. 436 (1792)).

In the case *In re Application of the President's Commission on Organized Crime, Subpoena of Scaduto ("Scaduto"),* 763 F.2d 1191 (11th Cir.1985), the Eleventh Circuit held that service of two Article III judges on the Commission on Organized Crime was unconstitutional. Although the Third Circuit held to the contrary in *In re the President's Commission on Organized Crime, Subpoena of Scarfo,* 783 F.2d 370 (3d Cir.1986), we find *Scaduto* to be the better reasoned case. *See United States v. Estrada, supra,* 680 F.Supp. at 1335–1336 n. 31.[6]

Alternatively, federal judges may perform work which is non-adjudicatory in nature but ancillary to the administration of justice. *See Sibbach v. Wilson & Co.,* 312 U.S. 1, 61 S.Ct. 422, 85 L.Ed. 479 (1941) (judges may promulgate rules of procedure); *In re Certain Complaints Under Investigation,* 783 F.2d 1488 (11th Cir.), *cert. denied,* 477 U.S. 904, 106 S.Ct. 3273, 91 L.Ed.2d 563 (1986) (judges may serve on commissions investigating judicial misconduct). Yet, we reject the contention that the Commission's promulgation of the Guidelines was either procedural in nature (*see Miller v. Florida,* — U.S. —, —, 107 S.Ct. 2446, 2452–53, 96 L.Ed.2d 351, 362 (1987)) or ancillary to the administration of justice to fall within the narrow exceptions outlined in *Sibbach* and *Certain Complaints, supra. See Estrada, supra,* at 1327–29.

In summary, the Act violates the expansion of powers branch of the separation of powers doctrine by placing the Commission in the judicial branch and by requiring service of three Article III judges on the Commission.

## C. Impairment of Function

The "impairment of function" analysis embodies the principle that one branch of the federal government may not act so as to impair the function of another branch. Our threshold inquiry is whether action by one branch has the potential to prevent the

---

5. Congress' apparent intent to substantially involve the judiciary in promulgating the Guidelines belies the government's argument that placement of the Commission in the judicial branch was a matter of "mislabelling," severable from the balance of the Act. *See Arnold,* 678 F.Supp. at 1470. *See also post* at 1516 (Hupp, J., dissenting) ("[t]he legislative history makes clear that Congress intentionally sought to place the Sentencing Commission 'in the judicial branch.'").

6. We disagree with the government's position that voluntary service of Article III judges on the Commission is permissible because the judge-Commissioners act in their capacity as individuals, not as courts, while performing Commission work. The separation of powers doctrine was designed to circumscribe concentration of power in the hands of individuals as well as in the domain of one or more branches of government. *See* Comment, *Separation of Powers and Judicial Service on Presidential Commissions,* 53 U.Chi.L.Rev. 993, 1009 (1986). Thus, what is objectionable here is that judges are compelled to wear two hats—one judicial, one executive, *Arnold, supra,* 678 F.Supp. at 1471, not that the judge-Commissioners must wear two hats simultaneously.

affected branch from accomplishing its constitutionally assigned function. *Nixon v. Administrator of General Services,* 433 U.S. 425, 443, 97 S.Ct. 2777, 2790, 53 L.Ed. 2d 867 (1977). If potential impairment is found, then the action is invalid unless justified "by an overriding need to promote the constitutional authority of Congress." *Id.*

Our concern here is that service of Article III judges on the Commission threatens the independence and impartiality of the judiciary, both in fact and in public perception. We find both quantitative and qualitative impairment of the judiciary by judges' service on the Commission. The Commission takes three distinguished jurists from the ranks of an already understaffed federal judiciary for one or two six-year terms. 28 U.S.C. §§ 992(a) and (b). Moreover, upon their return to the bench the former Commissioners will likely be forced to recuse themselves from virtually all criminal cases involving adjudication of the guidelines.

Of even greater concern is the qualitative threat to the independence and impartiality of the judiciary, which the framers sought to ensure by Article III's provisions of lifetime tenure and non-reduction in salary. *See United States v. Arnold, supra,* 678 F.Supp. at 1471–72; *Estrada, supra,* 680 F.Supp. at 1331–36; Comment, *Separation of Powers and Judicial Service on Presidential Commissions,* 53 U.Chi.L.Rev. 993, 1011–16 (1986) (*"Presidential Commissions"*). Impairment of the independence and impartiality of the judiciary results from the Commission's extensive involvement with the executive branch. The President's power to appoint judges to the not undesirable positions on the Commission, section 991(a), raises the ominous spectre of further politicization of the judiciary. The President's removal power over the judge-Commissioners creates similar concerns. Thus, the President holds the carrot of appointment and the stick of removal over Article III judges' service on the Commission.

The Eleventh Circuit found in *Scaduto, supra,* that the investigatory and advisory duties of one active federal judge and retired Supreme Court Justice Potter Stewart on the President's Commission on Organized Crime threatened the impartiality of the individual judge-Commissioners sufficient to violate the separation of powers. *Scaduto,* 763 F.2d at 1197–98. Here, the impairment must be viewed as even greater as the Commission's work is not merely investigatory or advisory but at its core involves enactment of binding, substantive rules to be followed by all federal courts. The Judicial Conference's required recommendation to the President of six judges for Commission membership, 28 U.S.C. § 991(a), further involves the judiciary in the work of an executive body. *See Arnold, supra,* 678 F.Supp. at 1472.

Finally, even if the apparent threats to the independence and impartiality of the judiciary posed by the Act prove to be overstated, the perception of non-independence and non-impartiality by litigants and the general public occasioned by the excessive involvement of judge-Commissioners with the executive branch is sufficient to violate the impairment branch of the doctrine of separation of powers. *Id.; see also Presidential Commissions, supra,* at 1016–19.

Having found that the Act presents a significant threat to the judicial function, it is also evident that the second, "overriding need," prong of the *Nixon* test, 433 U.S. at 443, 97 S.Ct. at 2790, is not satisfied by the Act. Congress could have achieved its goal of enacting sentencing reform, with the assistance of federal judges, by utilizing judicial participation of a non-mandatory character consistent with the requirements of the Constitution. *Arnold, supra,* 678 F.Supp. at 1472; *Presidential Commissions, supra,* at 1019. Accordingly, we find that the service of Article III judges on the Commission violates the "impairment of function" branch of the separation of powers doctrine.

## DUE PROCESS

■ In addition to the Sentencing Reform Act's structural defects—the location and composition of the Sentencing Commis-

sion—the Guidelines as formulated are substantively invalid. Quite simply, the mechanical formulas and resulting narrow ranges of sentences prescribed by the Guidelines violate defendants' right to due process of law under the Fifth Amendment by divesting the Court of its traditional and fundamental function of exercising its discretion in imposing individualized sentences according to the particular facts of each case. *See United States v. Barker*, 771 F.2d 1362 (9th Cir.1985) (application of mechanical sentencing procedures violates due process); *see also United States v. Frank, supra*, at 817–19.[7]

■ Undeniably, sentencing involves a most extreme deprivation of personal liberty and, therefore, compels a highly individualized process. *Estrada, supra*, at 1318. The Ninth Circuit has recently endorsed this principle by stating:

> [T]he concept of individualized sentencing is firmly entrenched in our present jurisprudence.... "[p]unishment should fit the offender and not merely the crime. The belief no longer prevails that every offense in a like legal category calls for an identical punishment without regard to the past life and habits of a particular offender."

*Barker*, 771 F.2d at 1365 (quoting *Williams v. New York*, 337 U.S. 241, 247, 69 S.Ct. 1079, 1083, 93 L.Ed. 1337 (1949)).[8]

The Guidelines do require a court to consider certain enumerated factors specific to individual offenders which are unrelated to their offense(s) of conviction.[9] However, the rigid, computerized nature of the guidelines—which assign positive or negative numerical values to various sentencing factors and "adjustments"—precludes the trial court from *weighing* the importance of aggravating and mitigating factors relating to both the offender and the offenses of conviction. *Frank, supra*, 682 F.Supp. at 819. This weighing responsibility of the trial judge rests at the core of due process. *Id.* at 819. Further, the Guidelines offend the guaranties of due process by depriving the defendant of the opportunity to affect the court's weighing of all relevant factors at the time of sentencing. *Id.*

Application of the well-established balancing test set forth in *Mathews v. Eldridge*, 424 U.S. 319, 335, 96 S.Ct. 893, 903, 47 L.Ed.2d 18 (1976), reinforces our conclusion that the Guidelines afford insufficient process to survive scrutiny under the Fifth Amendment. *See Frank, supra*, at 819. The *Mathews* test balances the nature of the interest involved, risk of error under the challenged process and value of additional procedural safeguards, against the administrative and procedural burden of the additional safeguards. *Mathews*, 424 U.S. at 335, 96 S.Ct. at 903. A defendant's liberty interest affected by criminal sentencing is substantial. The formulaic nature of the Guidelines creates a great risk of error by giving inadequate consideration to the particular facts of a defendant's case. Revesting the court with its traditional

---

7. The Due Process clause of the Fifth Amendment provides that "No person shall be ... deprived of life, liberty, or property, without due process of law." The Court's due process analysis is made *sua sponte* in light of our consideration of the *Frank* decision, *supra*, issued shortly before the en banc hearing. Counsel were given the opportunity to address our due process concerns at the hearing.

8. The dissent contends that Congress can validly prescribe specific or indeterminate sentences for specific crimes, *post* at 1519 (Hupp, J., dissenting) (citing *United States v. Grayson*, 438 U.S. 41, 45, 98 S.Ct. 2610, 2613, 57 L.Ed.2d 582 (1978); *Williams v. New York*, 337 U.S. 241, 247, 69 S.Ct. 1079, 1083, 93 L.Ed.2d 1337 (1949)). However, both *Grayson* and *Williams* make only passing reference to the outmoded and largely discarded historical practice of legislative prescription of fixed sentences. Neither case states that fixed sentences would comport with due process as a constitutional matter. To the contrary, the Supreme Court stated in *Williams*, "[h]ighly relevant—*if not essential*—to [a judge's] selection of an appropriate sentence is the possession of the fullest information possible concerning the defendant's life and characteristics." 337 U.S. at 247, 69 S.Ct. at 1083 (emphasis added). The Court further asserted, "[f]or the determination of sentences, justice generally requires consideration of more than the particular acts by which the crime was committed and that there be taken into account the circumstances of the offense together with the character and propensities of the offender." *Id.*, 337 U.S. at 248 n. 10, 69 S.Ct. at 1083 n. 10 (citation omitted).

9. *See supra*, note 3.

duty of discretion both decreases the risk of error by maximizing the individualized nature of sentencing, and is a lesser burden on the courts, probation departments and counsel than use of the complicated and cumbersome Guidelines.

## DELEGATION DOCTRINE

■ Defendants also charge that in the Sentencing Reform Act Congress has made an unlawful delegation of legislative power (to the Commission) which, under Article I of the Constitution, must remain with Congress. *See A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495, 55 S.Ct. 837, 79 L.Ed. 1570 (1935); *Panama Refining Co. v. Ryan*, 293 U.S. 388, 55 S.Ct. 241, 79 L.Ed. 446 (1935). Although Congress cannot delegate its legislative function to other branches of government, it is not prohibited from seeking the assistance of coordinate branches in the exercise of its legislative power. *J.W. Hampton, Jr. & Co. v. United States*, 276 U.S. 394, 406, 48 S.Ct. 348, 351, 72 L.Ed. 624 (1928). Congress can constitutionally delegate legislative power so long as it supplies in the authorizing legislation "an intelligible principle to which the person or body authorized [to issue regulations] is directed to conform." *Id.* 276 U.S. at 409, 48 S.Ct. at 352; *National Cable Television Ass'n v. United States*, 415 U.S. 336, 342, 94 S.Ct. 1146, 1150, 39 L.Ed.2d 370 (1974); *see also* Schoenbrod, *The Delegation Doctrine: Could the Court Give it Substance?*, 83 Mich.L.Rev. 1223, 1229 (1985).

First, we reject defendants' contention that the prescription of sentences is a nondelegable "core" legislative function. This argument lacks both precedent and a workable method for distinguishing "core" from "non-core" functions. *See Lichter v. United States*, 334 U.S. 742, 778–79, 68 S.Ct.

1294, 1313–14, 92 L.Ed. 1694 (1948); *Synar v. United States*, 626 F.Supp. 1374, 1385 (D.D.C.) (three-judge court), *aff'd sub nom. Bowsher v. Synar*, 478 U.S. 714, 106 S.Ct. 3181, 92 L.Ed.2d 583 (1986); *United States v. Myers*, —— F.Supp. ——, Criminal No. 87–902, slip op. at 10–11 (N.D.Cal. Apr. 11, 1988); *United States v. Ruiz–Villanueva*, 680 F.Supp. 1411, 1416–17 (S.D.Cal.1988). In addition, the theory ignores the traditional delegation of substantial sentencing authority to the executive branch, and to the courts, which have historically determined sentences from broad ranges set by Congress, *Myers, supra*, at 11; *Ruiz–Villanueva, supra*, 680 F.Supp. at 1416–17.

Second, defendants assert that a narrower range of delegation is permissible where Congress has delegated legislative power involving impairment of fundamental rights, such as the liberty interest involved in sentencing. *See Kent v. Dulles*, 357 U.S. 116, 129, 78 S.Ct. 1113, 1120, 2 L.Ed.2d 1204 (1958) (right to travel); *United States v. Rumely*, 345 U.S. 41, 46, 73 S.Ct. 543, 546, 97 L.Ed. 770 (1953) (First Amendment). While we do not agree that these cases support defendants' view that a narrower delegation may be required here,[10] Congress' delegation to the Commission to promulgate sentencing guidelines includes abundant guidance and direction sufficient to satisfy even this purported higher standard. *See, e.g.*, 28 U.S.C. §§ 991(b) and 994; *United States v. Arnold*, 678 F.Supp. at 1467–69; *Ruiz–Villanueva, supra*, 680 F.Supp. at 1417–18; *Myers,* —— F.Supp. ——, *supra*, slip op. at 14–15. Accordingly, defendants' delegation doctrine argument must fail.

## CONCLUSION AND ORDER

■ For the foregoing reasons, the Court concludes that the Sentencing Re-

---

10. Defendants rely on the Supreme Court's statement in *Kent*, "[w]here activities or enjoyment, natural and often necessary to the well-being of an American citizen, such as travel, are involved, we will construe narrowly all delegated powers that curtail or dilute them." 357 U.S. at 129, 78 S.Ct. at 1120. However, this passage concerns statutory interpretation of the legislation at issue, not the constitutionality of its delegation. This is gleaned from the statement's plain language and the sentence which immediately precedes it, which states, "[a]nd if [the] power [to regulate foreign travel] is delegated, the standards must be adequate to pass scrutiny by the accepted tests, *id.* (emphasis added) (citing *Panama Refining, supra*). The *Rumely* case involved the permissible scope of delegation of investigative powers to a Congressional subcommittee and, therefore, is inapposite.

form Act of 1984 and Guidelines promulgated thereunder are unconstitutional because they violate both the doctrine of separation of powers and defendants' Fifth Amendment right of due process.[11]

Now, therefore, this matter having come on for a special en banc hearing before the members of this Court on April 18, 1988; and the Court having fully considered the pleadings and papers submitted by counsel for defendants, the Department of Justice and the United States Sentencing Commission, as *amicus curiae*, including the points and authorities submitted in support of and in opposition to the motions; and the arguments made by the parties and the Commission at the hearing; and good cause appearing:

IT IS HEREBY ORDERED, ADJUDGED AND DECREED AS FOLLOWS:

1. The Sentencing Reform Act of 1984 and the Guidelines promulgated pursuant to the Act are hereby declared unconstitutional and invalid in these cases before the en banc panel of the Court;

2. This decision is binding upon the members of this Court in all relevant cases unless and until we receive a contrary ruling from the Ninth Circuit or the Supreme Court.

3. It is further ordered that this decision and order is certified for such immediate appeal or writ as is available under Federal statutes and appellate procedure, particularly 28 U.S.C. §§ 1252, 1254(1), 1292, and 2101(e); and Rule 18 of the Supreme Court Rules; and in this connection the Court is of the opinion that this decision and order involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the decision and order may materially advance the ultimate termination of litigation; and further, the Court believes that this case is " ... of such imperative public importance as to justify the deviation from normal appellate practice and to require immediate settlement in this [Supreme] Court."

REAL, C.J., and TAKASUGI, PFAELZER, HATTER, MARSHALL, GADBOIS, RAE, IDEMAN, LETTS, TEVRIZIAN, DAVIES and LEW, District Judges, and KELLEHER, Senior District Judge, concur.

HUPP, District Judge, dissenting.

We respectfully dissent. In dissenting, we note that the court as a whole decided that the issue of facial unconstitutionality of the Sentencing Reform Act of 1984 was severed from each individual case and is to be decided by the court as whole. We concurred with that procedure, to the end that there be uniformity of decision in the Central District pending final resolution of the problem. Our dissent from the result reached by the majority does not mean that the court's decision expressed in the majority memorandum is not applicable in our individual courts pending appellate decision. No other aspect of individual cases has been decided by the whole court and individual judges will continue to handle such aspects in each case.

The majority memorandum has identified separation of powers and due process of law as the principal constitutional problems with the Sentencing Reform Act of 1984 (hereafter, the "Act"). Within the Act, the important separation of powers problem to consider is whether Congress impermissibly extended or impaired the powers of the judiciary by the creation of the Sentencing Commission "in the judicial branch" of government and by requiring that three Article III judges be members of the Commission. We believe that neither consideration requires a declaration at this judicial level that the Act is unconstitutional. We believe that the Act does not violate due process. We agree with the majority memorandum that the Act is not unconstitutional on grounds of delegation of powers.

1. *The Act is not unconstitutional because it purports to place the Sentencing Commission in "the judicial branch" of*

---

**11.** We disagree with the holding in *Estrada, supra,* at 1337–38, that the Guidelines are severable from the Act. To the contrary, it appears to us that the Guidelines are the very heart and soul of the Act. Without them, the Act is a futility.

*government.* It is suggested that placing the Sentencing Commission "in the judicial branch" either expands or impairs the judiciary in a constitutional sense. We disagree. The legislative history makes clear that Congress intentionally sought to place the Sentencing Commission "in the judicial branch." However, to suggest that this label makes the Act, or the creation of the Sentencing Commission, unconstitutional, elevates semantics over substance. While "branch" is a convenient shorthand expression, the Constitution does not create "branches"; instead, it allots powers. Thus, "All legislative Powers herein granted shall be vested in a Congress ..." (Article I, Section 1), "The executive Power shall be vested in a President of the United States ..." (Article II, Section 1), and, most important for this memorandum, "The judicial Power of the United States, shall be vested in one Supreme Court, and in such inferior Courts as the Congress may from time to time ordain and establish" (Article III, Section 1). It follows that in considering constitutionality, we must not look to the assignment of the Commission to a "branch," but instead determine whether the creation and function of the Sentencing Commission impairs or extends the powers of the courts inconsistently with the Constitution. The label placed by Congress ("in the judicial branch") is constitutionally meaningless; instead, what must be examined are the function and powers of the Commission without the distraction provided by the label, which serves semantic purposes only. It seems unnecessary to declare that the label is unconstitutional but unimportant to the functional plan of the Act and, there-fore, severable; it may be ignored as meaningless.[1]

2. *The Sentencing Commission performs no function allotted to the judiciary by the Constitution.* The majority memorandum notes, correctly in our view, that the intended work of the Commission most closely resembles that of an executive department or independent agency authorized to write regulations to implement legislation enacted by Congress. Such regulation making has long been considered to be a part of the duty of the executive to "take Care that the Laws be faithfully executed ..." (Article II, Section 3), when authorized by Congress. That the regulations are binding on the court is nothing new. Courts have always been bound by legislation and regulations validly adopted thereunder. Judicial functions, on the other hand, are defined by the Constitution to be the decision of "cases" and "controversies" (Article III, Section 2). The Commission does not decide "cases" or "controversies." To the contrary, the duty of the Commission is confined to the writing of the regulations (denominated "guidelines") by which judges are to decide the cases. Executive departments or independent agencies have been doing this for at least half of the period the Constitution has been in existence. Since regulation or guideline writing does not involve the decision of cases or controversies, nor does it impinge on the power of the judiciary to decide the same, the mere creation of a Commission that creates sentencing guidelines does not violate the separation of powers doctrine. Whether the Commission is tagged with the "judicial branch," "executive branch," or "independent agency" label is an irrelevancy in determining whether its functions impair or expand judicial powers.[2]

---

1. The government would reach the same result by the alternative path of analysis. It argues that if the Commission is, in fact, placed in the "judicial branch" of government, the characteristics given the Commission by Congress might render it unconstitutional. However, the government argues that the "judicial branch" label may be severed from the rest of the Act and disregarded as unconstitutional for the reason that the label is entirely non-substantive and to disregard it would not affect the congressional plan at all (*Alaska Airlines Inc. v. Brock,* 480 U.S. ——, 107 S.Ct. 1476, 94 L.Ed.2d 661 (1987)).

2. Other courts have held that the Act is constitutional for the reasons stated by Judge Enright in (*United States v. Ruiz–Villanueva,* 680 F.Supp. 1411 (S.D.Cal.1988)). That reasoning, stated in summary, is that the Commission is validly placed in the "judicial branch", and that such placement is sustainable because the Commission in fact acts as an aid to judges in doing their sentencing duty. This approach analogizes the Sentencing Commission to other bodies doing non-judicial work in the judiciary, such as judicial councils (*Chandler v. Judicial Council of the Tenth Circuit,* 398 U.S. 74, 90 S.Ct. 1648, 26

To be sure, if one could properly conclude that the Commission was doing work confided to the judiciary by the Constitution, then major constitutional problems would exist (*i.e.*, non-Article III judges doing judicial work (*Northern Pipeline Construction Co. v. Marathon Pipeline Co.*, 458 U.S. 50, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982)), power to remove Commissioners for cause by the President (*Bowsher v. Synar*, 478 U.S. 714, 106 S.Ct. 3181, 92 L.Ed.2d 583 (1986))). However, since the Commission does not decide cases or controversies, but writes regulations, it does nothing confided by the Constitution to the sphere of the judiciary. A *non-sequitur* is also suggested: since the Commission does *not* decide cases and controversies, placing it in the judicial "branch" impermissibly expands the powers of the judiciary to that of rule makers. The answer should be clear from the above; we are not concerned with "branch" but allotment of power—since the Commission exercises no judicial powers, it does not impinge on the powers of the judiciary, whatever the label.

3. *Presence of judges on the Commission does not impair or expand the powers of the judiciary.* The most serious point made by the majority memorandum, on which reasonable minds could well differ, and which ultimately can only be decided by the Supreme Court, is whether the required presence of Article III federal judges on the Commission impairs or expands the powers assigned by the Constitution to the judiciary. It is argued that the powers of the judiciary are expanded because judges serving on the Commission assist in making regulations, and that the judiciary is impaired by having to decide cases under regulations made in part by other judges. We find these arguments insufficiently convincing. Our approach

should be a pragmatic and functional one which examines whether the presence of judges on the Commission either impinges or expands the power of judges in the real world.[3] We think that neither result follows, and that the maximum impact on the judiciary of having three judges serve on the Commission is that those judges may have to recuse themselves in cases involving the validity and interpretation of the guidelines—an insufficient effect to bring unconstitutionality. To put the problem in perspective, it is apparent that the task of the Commissioners is regulation or guideline writing, and not judging. Functionally, therefore, the judges on the Commission do not serve in a judicial role, but one akin to a member of a regulation writing board of an independent agency. In this sense, the judge wears an entirely different hat while serving on the Commission—he or she is like many judges in our history who, while serving in one capacity as federal judge, serves in another capacity in the executive. The list of historical precedent is lengthy, starting with Chief Justice Jay serving as ambassador to England, and, *inter alia*, noting Justice Jackson's role as prosecutor at Nuremberg and Chief Justice Warren's chairmanship of the commission to investigate the death of President Kennedy, and most recently Judge Kaufman's participation as a member of the President's Commission on Organized Crime. The latter episode generated two Court of Appeals opinions with opposite holdings (*In re Application of President's Commission on Organized Crime, Subpoena of Scaduto*, 763 F.2d 1191 (11th Cir.1985); *In re Application of President's Commission on Organized Crime, Subpoena of Scarfo*, 783 F.2d 370 (3d Cir.1986)). The difference between those opinions mirrors the current

L.Ed.2d 100 (1970)), groups to write the federal rules (*Sibbach v. Wilson & Co.*, 312 U.S. 1, 61 S.Ct. 422, 85 L.Ed. 479 (1941)), or commissions to consider discipline of judges (*In re Certain Complaints Under Investigation*, 783 F.2d 1488 (11th Cir.), *cert. denied*, 477 U.S. 904, 106 S.Ct. 3273, 91 L.Ed.2d 563 (1986)), each of which survived separation of powers challenges.

**3.** *See Nixon v. Administrator of General Services*, 433 U.S. 425, 443, 97 S.Ct. 2777, 2790, 53

L.Ed.2d 867, 891 (1977); Miller, Independent Agencies, 1986 Sup.Ct.Rev. 41, 52–53 (The pragmatic approach "tends to view the separation of powers as a practical approach to government such that the division of powers between the branches, and the system of checks and balances by which those powers are related to one another, can stand considerable stretching in order to accommodate the changing needs of a modern society").

debate on the guidelines. We prefer *Scarfo* to *Scaduto*, emphasizing, as it does, the pragmatic and functional approach to the constitutional question. If, then, the question is whether the presence of three judges on the Commission impacts in any real way the operation of the judiciary, the answer is not at all. We suggest:

a. The answer to the concern that three judges, in concert with four non-judges, are making regulations for all judges is simply that the three judges who are commissioners are not acting as judges at all in their Commission work, and no one thinks that they are.

b. The thought that the presence of three judges on the Commission would unduly influence other judges in judging the validity and interpretation of the guidelines is, to quote Judge Duplantier,[4] "patently meritless."

c. The theory that the three Commission members who are judges may not be able to sit in matters where the validity and interpretation of the guidelines is at stake has merit, but it is difficult to see why the result should be more than recusal, not to speak of unconstitutionality. The thought that the loss of these three judges in certain criminal cases imposes an extra load on the judiciary is certainly not sufficient impairment of the judiciary to bring unconstitutionality; only three of approximately 800 judges are affected. When Congress starts recruiting a sufficient number of volunteer judges to impair the work of the judiciary, then is the time to find functional impairment. The argument that the required presence of three judges on the Commission doing regulation writing work invalidates the legislation comes down to a concern about impurity of form. We are right to be suspicious about congressional requests to judges to do public work outside of the judiciary. However, our test is whether there is an impairment in fact in the operation of the judiciary; here there is none worth mentioning.[5]

It is also suggested that the required presence of three judges on the Commission impermissively expands the powers of the judiciary into the area of law making. However, this is only true if the judge-commissioners are performing judicial work in their service on the Commission. We have already seen that examined from a functional approach they do not. With that recognition, the problem is one of semantics only, and vanishes. It is noteworthy that no judge is required to do Commission duty. From the judge's standpoint, participation is voluntary. Thus, no constitutional question arises which might be present if a judge were required to do non-judicial work (*Hayburn's Case*, 2 U.S. (2 Dall.) 409, 1 L.Ed. 436 (1792); *United States v. Ferreira*, 54 U.S. (13 How.) 40, 14 L.Ed. 42 (1851)).

4. *Delegation of powers.* The majority memorandum does not hold that the Act is invalid as involving an impermissible delegation of legislative powers to the Commission. The vast majority of district judges who have considered this point have held that there is no impermissible delegation, and we agree, adopting the discussion of Judges Brewster[6] and Duplantier[7] on this point.

5. *The Act and Sentencing Guidelines are not unconstitutional on due process grounds.* We do not agree that the Act or the guidelines are subject to question on

---

**4.** *United States v. Chambless,* 680 F.Supp. 793, 800 (E.D.La.1988).

**5.** We do not take seriously the argument that, hypothetically, if a district judge were appointed to the Commission and, therefore, received during that period the pay of a circuit judge, and thereafter went back to his or her duties as a district judge, he or she would unconstitutionally have had his or her pay diminished while in office. The answer to the concern is that the judge, while serving on the Commission receives pay as a commissioner. When the judge reverts to judging, he or she receives pay as a judge—removal from the Commission thus does not cause diminished pay as a judge. Nor does the possibility of removal from the Commission affect status as a judge; thus, there is no impingement on the constitutional command that the judge serve "during good behavior."

**6.** *United States v. Arnold* (S.D.Cal.1988) 678 F.Supp. 1463.

**7.** *United States v. Chambless,* 680 F.Supp. 793, 795–797 (E.D.La.1988).

due process grounds. The majority memorandum does not rely on procedural due process in invalidating the Act on due process grounds. It is, therefore, unnecessary to detail the meticulous procedural steps provided for in the Act and guidelines.

Substantive due process is used to declare that the Act is invalid in depriving the courts of their traditional discretion to weigh the various factors considered by a judge in sentencing. To an extent the Act does just that; it does so in implementing the congressional policy that relative uniformity of sentencing of defendants similarly situated is important. Congress is entitled to assert its policy concerns, and does not violate the Due Process Clause by doing so.

Congress could, and has in the past, validly prescribed a specific sentence for each offense,[8] thus removing all discretion from the hands of the judge. More recently in our history, an executive department, the Parole Commission, has validly had an equal role with the judiciary in fixing sentences, applying its own guidelines,[9] with the result that most sentences have in fact been between one-third and two-thirds of the length of sentence pronounced by the judge. Indeterminate sentence laws which transfer the whole task of fixing the length of sentence to an executive department have not been held to violate due process.[10] Congress has validly prescribed minimum as well as maximum sentences for many offenses without due process repercussions. The factors normally considered in imposing a sentence have been considered by the Commission in accord with the instructions of Congress, and the weight to

be accorded each of those common factors has been specified. Here is where it appears that the majority finds the Act and guidelines are a violation of the Due Process Clause. How the conclusion is reached that the Due Process Clause eliminates congressional say-so about sentencing factors is not explained.[11] It is only suggested that the "traditional and fundamental" function of the courts to exercise this discretion has attained due process protection, without citation of any authority except a district court case concerning the Act and guidelines. As shown above, Congress can eliminate all discretion in sentencing, or place all discretion in an executive department body; *a fortiori*, it can specify the weight to be given the various factors normally considered.

In addition, the description of "the rigid, computerized nature" of the guidelines is considerably overblown. While the guidelines, in accord with congressional intent to make sentences more uniform, do specify the weight to be assigned common sentencing factors, they also allow departures from the guidelines for factors not covered by the guidelines or Congress (18 U.S.C. § 3553(b)) with certain exceptions. The exceptions are few: a judge may not consider race, sex, national origin, creed, and socioeconomic status (28 U.S.C. § 994(d)(11)). In addition, the Commission is to "reflect the general inappropriateness of considering the education, vocational skills, employment record, family ties and responsibilities, and community ties of the defendant" (28 U.S.C. § 994(e)). Certainly, eliminating the factors in the former listing would not violate due process. In the latter listing,

8. *See United States v. Grayson,* 438 U.S. 41, 45, 98 S.Ct. 2610, 2613, 57 L.Ed.2d 582, 586–87 (1978) (Citing Report on Twentieth Century Fund Task Force on Criminal Sentencing, Fair and Certain Punishment, 83–85 (1976)).

9. *Geraghty v. United States Parole Comm'n,* 719 F.2d 1199 (3d Cir.1983), *cert. denied,* 465 U.S. 1103, 104 S.Ct. 1602, 80 L.Ed.2d 133 (1984).

10. *See, e.g., Williams v. New York,* 337 U.S. 241, 248, 69 S.Ct. 1079, 1083, 93 L.Ed. 1337 (1949).

11. It is noted that the majority memorandum cites *United States v. Barker* 771 F.2d 1362 (9th Cir.1985) in support of the proposition that indi-

vidualized sentencing is required. That opinion, however, cites the Act favorably (footnotes 3 and 19) and does not suggest that having multiple factors evaluated by the Commission is in violation of law. The case stands for the proposition that a judge who considers only one sentencing factor to the exclusion of all others abuses his or her discretion. The clear implication of the opinion is that the multiple factor approach to sentencing decisions is desirable, but the opinion does not suggest or hint that only judges, to the exclusion of Congress, may implement the multi-factor approach.

there are many factors formerly commonly considered. Congress' policy is to discourage but not forbid all consideration of those factors, and the Commission has followed Congress' directions (Guideline 5H). It is difficult to see why Congressional direction in this respect violates the Due Process Clause, even if judges do not agree that such is wise.

What the Act does is require the judge rather than the Parole Commission to apply guidelines; there is no due process violation in this. We judges, who with remarkable uniformity believe that we can do a better job of fitting the sentence to the crime and the criminal than can any chart or grid, or numerical evaluation of factors, must refrain from the temptation to classify our own beliefs in this respect as constitutional dogma. Congress is entitled to raise its uniformity policy to a high level without the result being labeled a due process violation.

*Conclusion:* We believe that courts should be slow to declare acts of Congress unconstitutional, and should do so in only the clearest of cases. In our hierarchical judicial system, the responsibility for declarations of unconstitutionality traditionally belongs in the appellate courts. Chaos of the type we are now about to undergo results otherwise.[12] A logical and rational argument for the constitutionality of the Act exists and should be adopted by us pendente lite.

*Recommendation regarding review:* We entirely agree with paragraph 3 of the order, urging prompt review of the question in the Court of Appeals and recommending that the Supreme Court take the matter directly and decide it promptly. The question at issue affects cases daily in every federal court in the country, and the public interest is that it be decided definitively and promptly.

BYRNE, KENYON, RAFEEDIE, RYMER, STOTLER, FERNANDEZ, KELLER and WILSON, District Judges, and GRAY, Senior District Judge, concur.

---

12. The "chaos" adverted to is in numerous areas of practice and procedure; for example: 1. Is the Act as a whole invalid or only the guidelines? 2. Does parole still exist, and, if not, how should this affect sentencing decisions? 3. Should we utilize alternative sentencing and, if so, are there problems of uncertainty as to what, in fact, the judgment consists of? 4. Should we sentence under the guidelines when a defendant does not challenge the validity of or desires to be sentenced under the guidelines? 5. What information should the Probation Officer develop—a guidelines report, a preexisting law report, or both? 6. How do we take a plea? 7. How is a defense attorney to advise the client as to the effect of the plea? 8. Does the repeal of certain parts of the old statutory scheme fall with the unconstitutionality of the new provisions? Other knotty problems can be seen with a little imagination.